IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ANTONIO BARKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 5:21-CV-381 (CAR) |
| ALBERTO FERRER; RICHARD | : | |
| STEVEN GATLIN; RANDY | : | |
| GONZALEZ; and DAVID DAVIS; | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Antonio Barker, a pretrial detainee in the Bibb County Jail, brings excessive force and supervisory liability claims pursuant to 42 U.S.C. § 1983 against former Bibb County Sheriff's Deputy Alberto Ferrer, Lieutenant Richard Gatlin, Captain Randy Gonzalez, and Sheriff David Davis. Plaintiff contends Defendants violated his Fourteenth Amendment rights after Defendant Ferrer repeatedly struck his head with an ASP baton. Plaintiff also brings Georgia state-law claims for assault and battery against Defendant Ferrer. Currently before the Court are Defendant Ferrer's Motion for Summary Judgment and Defendants Lt. Gatlin, Cpt. Gonzalez, and Sheriff Davis's (the "BCSO Defendants") Motion for Summary Judgment. After careful consideration, the Court finds Defendant Ferrer is not entitled to qualified immunity on Plaintiff's § 1983

excessive force claim or official immunity on his state law assault and battery claims; thus, his Motion for Summary Judgment [Doc. 33] is **DENIED**. The BCSO Defendants, however, are entitled to qualified immunity, and their Motion for Summary Judgment [Doc. 47] is **GRANTED**.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *See id.* at 249-52.

[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

Plaintiff filed suit for excessive force after Defendant Ferrer repeatedly struck him in the head with an ASP baton while he was detained in the Bibb County Law Enforcement Center ("LEC" or "Jail"). The record contains video evidence from the Jail. The United States Supreme Court has recognized a "wrinkle" in cases where the record contains video evidence, holding that when facts are disputed, and video evidence is present, a court should "view[ ] the facts in the light depicted by the videotape."[8] Following the Supreme Court and viewing the facts in the light most favorable to Plaintiff, the evidence reveals the following:

---

[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[8] *Scott v. Harris*, 550 U.S. 372, 381 (2007).

Defendant Ferrer was employed as a deputy sheriff of the Bibb County Sheriff's Office ("BCSO"), assigned to the Corrections Division, and worked in the Bibb County Jail from December 18, 2017, until he was terminated on January 13, 2020, for violations of the BCSO policies after his use of force on Plaintiff.[9]

<u>Bibb County Jail Policies and Disciplinary Procedure</u>

The Bibb County Jail is staffed by some 140 deputy sheriffs and corrections officers—including command staff sergeants, lieutenants, captains, and a ranking major—and houses more than 900 individuals charged or convicted of misdemeanor or felony offenses.[10]

Defendant Ferrer worked as a Corrections deputy. Corrections deputies conduct daily inmate activities at the Jail such as feeding, cleaning, court appearances, medical appointments, visitations, etc.[11] Each deputy is assigned to a squad (squads A-E) on either the day shift or the night shift and is supervised by a squad sergeant; squad sergeants report to squad lieutenants who oversee the squad; squad lieutenants report to Corrections Captains who are operationally assigned to a particular area of Corrections operations (booking/service desk, detention, and "main jail"); Captains report to the

---

[9] Scarbary Aff. ¶ 15 [Doc. 47-2]; Termination Letter [Doc. 47-3, pp. 1-3].
[10] Scarbary Aff. ¶ 5.
[11] *Id*.

Corrections Major, who reports to the Colonel, who reports to the Chief Deputy, who reports to the Sheriff. When the events in this case took place, Defendant Lt. Gatlin was Defendant Ferrer's squad lieutenant; Defendant Captain Gonzalez was the unit Corrections Captain; Michael Scarbary, who is not a defendant in this case, was the Chief Deputy; and Defendant David Davis was the Sheriff.

The BCSO maintains a Use a Force Policy which prohibits the use of excessive force and requires deputies to complete an incident report for each use of physical force on detainees and inmates. The report must include a detailed description of the incident, the type and amount of physical force used, justification for such force, and any impairment or injury caused by the use of force. The BCSO Use of Force Policy states:

I.  POLICY
    Staff officers in the Bibb County jail shall use the minimum amount of force necessary to control inmates.
II. PROCEDURES
    A.  In the event an inmate becomes uncooperative, the staff officer is to give the inmate a verbal order to cease his behavior.
    B.  If the inmate continues to be uncooperative, the staff officer should notify the shift supervisor to request backup help to physically control the inmate.
    C.  Staff officers shall use the minimum force necessary to physically control an inmate.
    D.  Staff members shall only use a method or weapon to control an inmate that they have been trained to use and that has been approved by the agency.

E. Staff officers may use their fist, foot, riot baton, or similar weapons only when one or more of the following circumstances exists, and then only to the extent that such force is reasonable.
   1. When an inmate in custody attempts to escape.
   2. When two or more persons assault a staff officer.
   3. When an individual of obvious physical superiority or aggressiveness assaults a staff officer.
   4. When an individual commits or is attempting to commit an attack on a third party.
F. Before a staff officer uses physical force, the inmate must have demonstrated the ability and opportunity to harm the officer or a third party and express verbally or through his actions his intent to use force against the officer or the third party.
G. A staff officer may use deadly force against another person only if the officer or their party's life is in immediate danger.
H. Under no circumstances are staff members to use excessive force to control inmates. Any staff member determined to have used excessive force shall be disciplined appropriately with suspension, to be determined by the sheriff, up to termination and prosecution.
I. After physical force has been used against a person, and he has been subdued, staff members are to provide the inmate with the appropriate medical treatment. As soon as possible the inmate is to be examined by the medical personnel in accordance with Policy 5-4.
J. Medical treatment shall be provided if a person has obviously suffered physical injury, complains of an injury, requests a medical examination, or more than slight physical force was employed.
K. Anytime a staff officer(s) uses physical force, the officer(s) involved and witnesses must complete an incident report that includes:
   1. A detailed description of the incident.
   2. Type and amount of physical force used.
   3. Justification for such force.
   4. Any impairment or injury caused by the use of force.
   5. Listing of participants and witnesses.
   6. Action taken pursuant to the incident, especially medical treatment.
   7. Photographs of both the person and officers involved an any injuries received.
   8. Any disciplinary charges filed against the inmate.

6

L.  In the event the jail officer is accused of using excessive force, the Administrative or Operations Captain is to investigate the incident and report his findings to the Office of Professional Standards Captain, Chief Deputy, and Sheriff.[12]

Sheriff Davis testified that BCSO Corrections Officers are required to complete a use of force incident report "[a]nytime a staff officer(s) uses physical force" on a detainee or inmate.[13] The use of force reports are "filled out all across the Sheriff's Office whenever different types of force are being used. And that force can run from anything to . . . putting handcuffs on somebody . . . putting hands on people, all the way up to use of deadly force, firearms."[14]

Each use of force report is reviewed by the deputy's squad sergeant and squad lieutenant who make an initial determination whether the force used was justified and within BCSO policy. The use of force report is then reviewed by the chain of command—the Administrative or Operations Captain, the Colonel, and finally Chief Deputy Scarbary—who makes a final determination whether the use of force is justified or if it needs to be referred to the Office of Professional Standards (Internal Affairs) ("IA") for further investigation. If a deputy is accused of using excessive force, the Administrative

---

[12] Use of Force Policy [Doc. 33-10].
[13] BCSO Use of Force Policy.
[14] Sheriff Davis Dep., p. 47.

or Operations Captain must investigate the incident and report his or her findings to the IA Captain.

When an IA investigation is authorized, IA investigators are responsible for investigating alleged violations of BCSO policy by deputies/BCSO personnel "in much the same way" that investigators in the Criminal Investigation Division ("CID") investigate alleged criminal violations for potential prosecution.[15] IA investigators interview witnesses and the accused deputy; obtain and compile evidence like video footage, photographs, and documentary materials; and report details of their investigation to the Sheriff and Chief Deputy.[16] Unlike CID investigations of alleged criminal offenses that may result in prosecution by the State, IA investigations of alleged BCSO policy violations may result in serious disciplinary action against BCSO personnel—suspension from duty without pay, demotion, or termination from employment.[17]

Internal Affairs investigations inform a determination on violations of BCSO policy and whether and what disciplinary measures should be imposed as a result.[18]

---

[15] Scarbary Affid. at ¶ 18.

[16] *Id*.

[17] *Id*.

[18] *Id*. at ¶ 19.

8

Sheriff Davis and Chief Deputy Scarbary review all IA investigations and confer whether disciplinary measures should be imposed if policy violations are found.[19] In addition to the report and evidence compiled by IA investigators, Chief Deputy Scarbary and Sheriff Davis consider other factors in discipline decisions such as a deputy's prior disciplinary record, disciplinary action taken in any comparable cases involving other BSCO personnel, and aggravating and mitigating factors, among other things.[20]

Sheriff Davis testified that IA investigations in excessive force incidents "can take several weeks. Sometimes . . . it could take a couple of months . . . because you have to do interviews with the particular deputies that were involved" and "have to catch them on their schedule."[21] Sheriff Davis stated that the BCSO "protocol is if there's an Internal Affairs investigation of a serious matter, that we suspend the particular deputy or employee."[22]

Sworn personnel of the BCSO, like Defendant Ferrer, have due process protections and other rights relating to their employment under the Bibb County Police Civil Service

---

[19] Scarbary Aff. ¶ 20.
[20] *Id.*
[21] Davis Depo., p. 62 [Doc. 39-19].
[22] *Id.* at p. 22.

Board & System.[23] Disciplinary measures that affect pay (suspensions from duty without pay) or rank and pay (demotions) and terminations from employment are subject to evidentiary hearing rights and judicial review under the Civil Service Code.[24] Only the "appointing authority" can impose these disciplinary measures, which is the Bibb County Sheriff or his designee by case-specific authorization.[25] In Defendant Sheriff Davis's administration, only Sheriff Davis and Chief Deputy Scarbary are authorized to impose these disciplinary measures.[26]

The use of force incident at issue in this case took place in the Infirmary area of the Bibb County Jail. The Jail has a fully operational medical Infirmary area which includes offices and operational space for licensed medical providers to conduct medical appointments and to diagnose, treat, and monitor medical conditions and prescribe necessary medications for inmates.[27] The Infirmary area includes a number of cells used to house inmates who require ongoing medical care and/or medical observation for a variety of medical and mental health conditions, including suicide watch.[28]

---

[23] Scarbary Aff. ¶ 21; Georgia Legislative Documents [Doc. 79-15].
[24] *Id*.
[25] *Id*.
[26] *Id*.
[27] *Id*. at ¶ 10.
[28] *Id*.

Macon-Bibb County contracts with a private corporation, CorrectHealth Bibb LLC, to provide health care services to inmates in the Jail; none of the medical providers who render or are otherwise involved in providing healthcare services to the inmates are employed by the BCSO.[29] At least one Corrections Divisions deputy is assigned to a post inside the Infirmary area for the duration of every duty shift with direct supervision view of all inmate cells in the Infirmary.[30] The duty post is positioned at a work station/oversized "cubicle" or credenza in the center of the Infirmary area of the Jail, with direct a direct view of all inmate cells in the Infirmary.[31] On any given ordinary day in the Jail, Corrections Divisions deputies and/or supervisors who are not assigned to the duty post in the center of the Infirmary area are in and out of the Infirmary and medical area dozens of times for various reasons—transporting inmates to and from medical appointments and back to housing blocks, bringing inmates to be housed in Infirmary cells for medical observation or for holding on suicide watch pending mental health provider assessments, and supervisor discussions with inmates housed in Infirmary cells, among others.[32]

---

[29] *Id.* at ¶¶ 11-12.
[30] *Id.* at ¶ 13.
[31] *Id.*
[32] *Id.*

The BCSO maintains a suicide prevention policy which requires deputies to perform a screen for suicide risk when they believe a detainee has a "current ideation, threat, or plan."[33] Deputies are required to "[r]emov[e] [ ] a detainee's clothing (including belts and shoelaces)" and give the detainee "an authorized suicide gown or suicide paper gown whenever clothing is removed."[34]

The Jail's Infirmary is equipped with a video camera. The camera records the common area of the Infirmary but not the inside of the individual cells. The camera does not record audio.

January 8, 2020 Use of Force Involving Plaintiff

On January 8, 2020, Plaintiff was a detainee in the Bibb County Jail awaiting trial on pending criminal charges.[35] BCSO Deputies Pettigrew and Barnes (not defendants in this case) were instructed to remove Plaintiff from his cell and escort him to the lockdown block for placing objects in his cell doorway.[36] In response to being told he was being taken to lockdown for violating Jail policy, Deputies Pettigrew and Barnes heard

---

[33] BCSO Suicide Prevention Policy [Doc. 33-15, p. 2].
[34] BCSO Suicide Prevention Policy [Doc. 33-15, p. 2].
[35] Davis Depo., p. 16 [Doc. 33-19].
[36] Pettigrew Officer Report; Barnes Officer Report; Pettigrew Depo., pp. 18, 20.

Plaintiff say he was going to kill himself.[37] Upon hearing that Plaintiff wanted to harm himself, Deputies Pettigrew and Barnes were required to bring Plaintiff to the Infirmary and place him in an Infirmary holding cell.[38] When Deputies Pettigrew and Barnes attempted to handcuff Plaintiff to escort him to the Infirmary holding cell, they each testified that Plaintiff became noncompliant and resisted.[39] Thus, the deputies grabbed Plaintiff by the arms and escorted him down the hall; the deputies contend Plaintiff continued to resist and disobey commands to continue walking.[40] Plaintiff disputes this version of the facts. He states that he never told the deputies he was going to commit suicide or harm himself and did not resist.[41]

Deputy Gilbert (not a defendant in this case) was on duty at the front desk of the Infirmary. When Deputies Pettigrew and Barnes arrived in the Infirmary with Plaintiff, she instructed them to place him in Infirmary Holding Cell I-106.[42] A fourth deputy, Deputy Haynes (not a defendant in this case), arrived in the Infirmary. The video footage shows that Plaintiff resisted Deputies Pettigrew and Barnes's attempts to place him

---

[37] Pettigrew Officer Report; Barnes Officer Report; Pettigrew Depo., pp. 15-16.
[38] Pettigrew Depo., p. 15.
[39] Pettigrew Officer Report; Barnes Officer Report; Pettigrew Dep., p. 56.
[40] *Id.*
[41] Pl. Decl. ¶ 4 [Doc. 38-1].
[42] Pettigrew Officer Report; Gilbert Officer Report; Barnes Officer Report.

inside the cell, and Pettigrew finally shoved him inside.[43] Deputies Pettigrew and Barnes went inside the cell with Plaintiff, and Deputies Gilbert and Haynes stood at the door of the cell.

The video camera in the Infirmary does not record footage inside the cell. While inside the cell, Pettigrew and Barnes testified that they instructed Plaintiff several times to remove his clothes and any items he had on his body, so he could be placed in a paper gown,[44] but Plaintiff refused. Thus, Pettigrew asked Deputy Gilbert to bring him a pair of scissors to cut Plaintiff's clothes off; Deputy Gilbert gave scissors to Deputy Barnes and went inside the cell with Pettigrew, Barnes, and Plaintiff.[45] Deputy Haynes also went inside the cell. Barnes attempted to use the scissors to cut off Plaintiff's clothes while he and Pettigrew restrained him,[46] but the officers contend Plaintiff continued to resist, pushed the officers away from him, and swung at Pettigrew with a closed fist.[47] Thus, Pettigrew and Barnes struck back at Plaintiff with closed fists.[48] Plaintiff, however, states

---

[43] Video at 0:23-0:53.
[44] Pettigrew Officer Report; Pettigrew Depo., p. 18.
[45] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report.
[46] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report; Pettigrew Dep., pp. 18, 58-59.
[47] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report; Pettigrew Dep., pp. 19, 59-60, 72.
[48] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report; Pettigrew Dep., p. 61.

never swung or attempted to punch any of the deputies.[49] Plaintiff was asking what he did to cause them to take him to suicide watch.[50]

While the four Deputies were inside the cell with Plaintiff attempting to get Plaintiff to comply and remove his clothes, Defendant Ferrer came to the Infirmary, rolled up his sleeve, and walked into the cell.[51] Ferrer was not wearing a utility belt and had no weapon.[52] Deputy Pettigrew was the only officer wearing a utility belt, and in his belt was an ASP baton.

When Defendant Ferrer entered the cell, Deputy Haynes exited and observed from the cell's doorway.[53] For two minutes and 15 seconds the four officers—Deputies Pettigrew, Barnes, Gilbert, and Defendant Ferrer—remained in the cell with Plaintiff. Plaintiff states that although he was reluctant to remove his clothes, he was not aggressive, did not actively resist, and did not pose any risk to the deputies.[54] The officers, however, stated that Plaintiff continued to resist, refused to undress, and made

---

[49] *Id.* at ¶ 11.
[50] *Id.* at ¶5.
[51] Video 1:31-140; Plaintiff Depo., pp. 16, 25.
[52] *Id.*
[53] Video 1:39-1:43.
[54] Pl. Decl. ¶¶ 4-5, 11 [Doc. 38-1].

several attempts to strike the officers.[55] The officers' attempts to remove Plaintiff's clothes with the scissors proved ineffective and potentially harmful because Plaintiff made continued attempts to injure himself by trying to place his head against the scissors.[56] Thus, the scissors were removed from the cell.[57] Plaintiff states he never attempted to injure himself or anyone else.[58]

While the four officers were inside the cell with Plaintiff, Defendant Ferrer, who was neither trained nor certified to use the ASP baton, removed Deputy Pettigrew's ASP baton from Pettigrew's utility belt and began to strike Plaintiff with the baton on his head and upper body.[59] When Plaintiff noticed he was bleeding, he attempted to cover his head with his arms and ran just outside the cell where he would be in view of the cameras.[60] He believed that Ferrer would stop beating him once he knew he was in view of the camera.[61] The video footage shows Plaintiff exited the cell with his arms covering his head, and Defendant Ferrer followed behind him continuing to strike Plaintiff

---

[55] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report; Pettigrew Depo., pp. 19, 59-60, and 72.

[56] Pettigrew Officer Report; Barnes Officer Report; Gilbert Officer Report; Pettigrew Depo., pp. 18, 58-59.

[57] *Id.*

[58] Pl. Decl. ¶ 5.

[59] Ferrer Depo., p. 33.; Pettigrew Report; Plaintiff Decl. ¶ 7.

[60] Pl. Decl. ¶ 7.

[61] *Id.* at ¶ 8.

numerous times in the head and upper body with the baton.[62] Deputy Pettigrew put

himself in between Defendant Ferrer and Plaintiff, and Ferrer paused from hitting

Plaintiff.[63] Ferrer then followed Plaintiff into the shower where there are no cameras and

tried to beat Plaintiff again but was stopped by the other deputies.[64] Plaintiff was

bleeding from his head, and there was blood in the shower, walls, and floor.[65] Deputy

Pettigrew requested medical assistance and contacted the supervising lieutenant on duty,

Lieutenant Patel.[66]

Plaintiff was eventually taken to the emergency department at Navicent Medical

Center where he was diagnosed with a head laceration and blunt trauma to other areas.

Plaintiff received five surgical staples for his head wound, and his left arm was placed in

a sling.[67]

Defendant Ferrer did not return to the Jail, was suspended from duty on January

10, 2020, and terminated on January 13, 2020, after the BCSO IA conducted an

investigation and found Ferrer violated the BCSO Use of Force policy.[68]

---

[62] Infirmary Video at 3:04-3:12.
[63] *Id.* at 3:10-3:12.
[64] Investigative File [Doc. 38-2, p. 11].
[65] *Id.* at p. 10.
[66] *Id.* at p. 9.
[67] Navicent Medical Records [Doc. 38-5].
[68] Scarbary Aff. ¶ 24.

Ferrer's Previous Use of Force Reports and Performance Evaluations

In the two years Defendant Ferrer worked in the Jail, he reported and filed 17 use of force incident reports. None of his previous uses of force involved the use of an ASP baton or any other weapon for which he was not trained to use. From the date his employment began on December 18, 2017, until an incident that occurred on December 13, 2019, wherein he used pepper spray on an inmate inside an Infirmary cell, each incident was reviewed by Corrections Division command staff members up through the chain of command to the Chief Deputy, and were found to be in compliance with the BCSO's use of force policy.

In the first six months of his employment, Ferrer was involved in four use of force incidents. On February 6, 2018, Ferrer "had to use force when he saw [the inmate] tried to turn around when [Ferrer] was escorting him out to sally port. [Ferrer] grabbed [the inmate] by the shoulders an[d] escorted him to the sally port, and [the inmate] tried to push back on [Ferrer]. [Ferrer] then had to push [the inmate] against the wall and restrained his arms."[69] Also on February 6, 2018, Ferrer responded to a fight between two inmates and had to restrain one of them by "grabbing him from behind and putting [his] arms around him to pull him down to the floor [ ] in a face down position" until the

---

[69] Roddreckious Williams Use of Force Report [Doc. 81-2, p. 4].

inmates could be separated.[70] On March 25, 2018, Ferrer suspected an inmate had contraband in his cell, so he "grabbed [an inmate] by the arms and escort[ed] him out of th[e] cell." When the inmate started resisting Ferrer's "physical and verbal commands to move, [Ferrer] kept dragging him down the stairs" and then got help from two other deputies to restrain him.[71] On April 20, 2018, Ferrer was in the control booth when he and another deputy saw an inmate throwing water in the day room. When Ferrer went to take the inmate to his cell, the inmate refused, and Ferrer "had to physically push him inside the cell."[72] All of these use of force incidents were reviewed by the chain of command, found to be in compliance with BCSO policies, and were not referred to IA for further investigation.

In June 2018, Ferrer received his first performance review for the first half of 2018 from his supervisor at the time Lieutenant, Wendy Underwood. Ferrer's strengths included "his enthusiasm and go-to-it attitude"; a strong functional knowledge of his responsibilities"; being "very security conscious"; ensuring "that things are running smoothly and to keep his block checks and paperwork on point."[73] Ferrer's "areas in need of improvement" included that he would "benefit from more training"; Lt. Underwood also stated Ferrer "is a bit high strung and needs to calm down a bit when dealing with

---

[70] Jonmauria Higgins Use of Force Report [Doc. 81-3, pp. 4-5].
[71] Searcy Use of Force Report [Doc. 81-4, p. 5].
[72] Quantarius Ross Use of Force Report [Doc. 81-5, p. 4].
[73] Performance Appraisal First Half 2018 [Doc. 81-1, p. 4].

inmates. Deputy Ferrer has a low tolerance for laziness and likes to stay busy. Hopefully in time he will become a valuable asset to the Bibb County Sheriff's Office."[74]

On January 21, 2019, Lt. Underwood gave Ferrer his performance evaluation for the second half of 2018. Lt. Underwood commented that Ferrer "demonstrates a comprehensive knowledge of his job and displays a high degree of emotional maturity. Deputy Ferrer [is] judicious in carrying out assignment." Ferrer's documented strengths included "a strong functional knowledge of his responsibilities," and he appeared "to be very security conscious." His documented areas of improvement states that "he can be too aggressive with the inmates sometimes. He needs to calm down and take a step back. Deputy Ferrer needs to follow chain of command when dealing with all situation," and he "needs to follow orders given to him by his supervisors that may be contradictory but not illegal."[75]

In April 2019, Ferrer was transferred to the squad commanded by Defendant Lt. Richard Gatlin.[76] On May 20, 2019, Lt. Gatlin investigated a use of force report by Ferrer when he used pepper spray against an inmate who was refusing to comply with order to return to his cell, spitting at inmates, becoming irate when Ferrer and another deputy came into the block, continuing to ignore the deputy's repeated commands to go into his

---

[74] *Id.*
[75] Performance Appraisal Form for Second Half of 2018 [Doc. 81-6].
[76] Doc. 46-4, p. 19.

cell, pushing the deputy, pulling what appeared to be a sharpened spoon from his mouth, threatening to cut Ferrer, and charging at Ferrer and trying to punch him.[77] Lt. Gatlin viewed the incident on camera and found Ferrer's actions justified and within BCSO policy.[78] Command staff members Defendant Corrections Captain Gonzalez, acting jail administrator Colonel Evins, and Chief Deputy Scarbury concurred with Gatlin's findings, and the incident was not referred for further investigation.

On July 16, 2019, Ferrer received his performance evaluation for the first half of 2019. His evaluator, Sergeant Washington, commented that Ferrer was "one of the toughest deputies on the squad. He absolutely fears nothing but failure. He is highly motivated and possesses a personal ethos that is anchored by his goal to be the best deputy of the squad in the jail. . . . Although he came to the squad with questionable performance issues, I believe he has thus forward made the most of a change of scenery and a second opportunity to prove his worthiness to wear the uniform. He is an asset."[79] Sergeant Washington noted Ferrer's strengths to include his intelligence, "impeccable grasp of both jail and criminal procedures," "physical courage," "loyal[ty] to his peers and the chain of command," and "the first to volunteer for any task in the jail." Sgt. Washington also commented that "[a]lthough Deputy Ferrer is an extremely important

---

[77] Davis depo. Ex. 21.

[78] *Id.*

[79] Performance Appraisal Form for First Half of 2019 [Doc. 81-8].

asset to the squad, his aggressiveness, attention to detail and officer safety would be best utilized in a reactionary force capacity, such as "E" squad or as a S.W.A.T. team member."[80] His areas in need of improvement included "at times need[ing] to exercise more tact in diffusing and deflecting verbal confrontations with inmates. He can come across as being combative and hostile towards peers at times, but if he were less guarded, those barriers would come down. Deputy Ferrer would benefit by patiently stepping back to let others shine, but not the risk of officer safety."[81]

On July 29, 2019, Lt. Gatlin reviewed a use of force reported by Ferrer against an inmate who refused to move when instructed, remained in Ferrer's face, ignored a directive to pack his belongings, refused to go out to the sally port when instructed, got up and pushed Ferrer, and assumed a fighting stance when Ferrer physically attempted to guide him off the block. Ferrer struck the inmate in the face. Sergeant Moore found the use of force justified and within BCSO policy, Lt. Gatlin concurred, and command staff members who reviewed the report—Defendant Captain Gonzalez, Colonel Aubrey Evins, and Chief Deputy Scarbary—concurred with Lt. Gatlin's findings, and the incident was not referred for further investigation.[82]

---

[80] *Id.*

[81] *Id.*

[82] William Lairsey Use of Force Report [Doc. 81-7].

On August 13, 2019, Lt. Gatlin reviewed a use of force report reported by Ferrer when he held an inmate's arm down with his knee after the inmate made threatening statements, and had to be physically turned by another deputy to keep facing and moving forward; the inmate refused to go in the cell despite orders to do so and being pushed by multiple deputies; attempted to break away when deputies put his hand behind his back; threw himself on the floor and refused to give deputies his hands so handcuffs could be applied; and tried grab Ferrer and kick another deputy. Sergeant Moore investigated the incident and found the use of force was reasonable and necessary and within BCSO policy. Lt. Gatlin concurred, and command staff members who reviewed the report—Defendant Gonzalez, Colonel Aubrey Evins, and Deputy Chief Scarbary—and the incident was not referred for further investigation.[83]

On October 13, 2019, Ferrer reported a use of force incident wherein he punched an inmate several times in the face and stomach, put him facedown on the floor, and pepper sprayed him twice after the inmate refused to comply with commands, made numerous threats to kill Ferrer, and "threw a punch" at Ferrer. The incident was investigated, and the command staff members who reviewed the report recommended it

---

[83] Ex. 21 Davis Depo.

be investigated further. Thus, Chief Deputy Scarbary referred the incident to IA. IA investigated the incident and found no policy violation.[84]

On October 17, 2019, Ferrer reported a use of force incident wherein an inmate was struck, taken to the floor, and held in place after an inmate refused commands and charged at multiple deputies. Defendant Gatlin concurred with Sgt. Shurley's findings that reasonable force had been used to detain the inmate and de-escalate the situation, and the use of force was justified and within BCSO policy. Command staff members concurred with the findings, and the incident was not referred for further investigation.

On December 13, 2019, Ferrer reported a use of force incident wherein he pepper-sprayed an inmate through the meal flap of the Infirmary cell door and closed the flap. The incident was investigated, and Chief Deputy Scarbary authorized a full IA investigation. As discussed more fully below, this pepper-spray incident was still under investigation when the events with Plaintiff took place over three weeks later on January 8, 2020. The IA investigation for this pepper spray incident was closed after Plaintiff was terminated on January 13, 2020.

On December 25, 2019, Ferrer reported a use of force incident in which he took an inmate "to the ground" and "used closed hand strikes" to get the inmate to comply after

---

[84] Lundy Use of Force Reports [Docs 79-1 through 79-6]. This incident was the subject of civil action *Devante Lundy v. Ferrer, Smith, Sims, Stokes,* Case No. 5:19-cv-510-TES-CHW. Summary judgment was granted for Defendants.

the inmate slapped Ferrer's arm down and resisted deputies by not placing his hands behind his back. The use of force was found justified and within BCSO policy. Defendant Gatlin concurred. On January 15, 2020, command staff members Captain Gonzalez and Colonel Evins believed the incident should be investigated further, but on February 5, 2020, Chief Deputy Scarbary did not refer the incident to IA for investigation.

On January 8, 2020, the same date on which the incident with Plaintiff occurred, Ferrer reported a use of force incident wherein Ferrer and another deputy struck an inmate, and Ferrer "tackled him against the floor" and stuck him in the face with his left elbow after the inmate refused to go back into the Infirmary cell, "lashed out" against another deputy, and hit Ferrer in the face.[85]

Termination of Defendant Ferrer

On December 17, 2019, Chief Deputy Scarbary referred Ferrer's use of pepper spray on the inmate through the meal flap of his Infirmary cell door that occurred on December 13, 2019, to IA requesting an initial review of the incident.[86] IA Captain Chris Patterson and Chief Deputy Scarbary discussed IA's initial review of the use of force report and video evidence, and Chief Deputy Scarbary gave verbal authorization for a

---

[85] Jackson Use of Force Report [Doc. 81-14].
[86] *Id.* at ¶ 18.

full IA investigation.[87] On December 26, 2019, Captain Patterson assigned the incident to be investigated.[88] Chief Deputy Scarbary signed and returned an Initial Review Form reflecting the authorization on December 27, 2019.[89]

Eleven days later, on January 9, 2020, Chief Deputy Scarbary became aware of the ASP baton incident with Plaintiff the day after it occurred on January 8, 2020, and authorized the IA investigation.[90] Because of the seriousness of the allegations and also because the December 13, 2019 pepper spray incident was under IA investigation, Chief Deputy Scarbary directed staff in his office to prepare a suspension letter notifying Ferrer of the decision to suspend him from duty pending the IA investigation involving Plaintiff.[91] The IA investigation on Ferrer's use of the baton on Plaintiff began immediately. IA personnel delivered the suspension letter to Ferrer when he was interviewed by IA on January 10, 2020.[92]

IA completed its investigation of the baton incident with Plaintiff on January 13, 2020.[93] Chief Deputy Scarbary conferred with Sheriff Davis, and based upon IA's findings

---

[87] *Id.* at ¶ 22.
[88] *Id.* at ¶ 22.
[89] *Id.*
[90] Scarbary Aff. ¶ 23.
[91] *Id.* at ¶ 24.
[92] *Id.*
[93] *Id.* at ¶ 25.

and evidence, Ferrer was terminated from employment because his "actions during the incident were both inconsistent with [his] training and in violation of the policies of the [BCSO]" including the Use of Force Policy."[94] The BCSO CID also investigated Defendant Ferrer's actions involving Plaintiff for potential prosecution for aggravated assault, but prosecuting officials of the Macon Judicial Circuit declined to prosecute him.[95]

IA completed its investigation of the pepper spray incident on January 10, 2020,[96] and closed its investigation on January 13, 2020, after Ferrer was terminated from employment.[97]

## DISCUSSION

Plaintiff filed suit asserting federal and state law claims alleging Defendant Ferrer used excessive force in violation of his Fourteenth Amendment[98] rights and assaulted and battered him in violation of Georgia state law. He alleges supervisory

---

[94] *Id.* at ¶ 26; Termination Letter [Doc. 38-2].
[95] Scarbary Aff. ¶ 28.
[96] *Id.* at ¶ 22.
[97] *Id.* at ¶ 27.
[98] In their Complaint, Plaintiff alleges that Defendants' actions violated his right to be free from excessive force under the Eighth Amendment. But "the Eighth Amendment's malicious-and-sadistic standard—which applies to incarcerated prisoners—does not extend to pretrial detainees." *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1174, 1181 (11th Cir. 2020) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 100-01). Instead, a pretrial detainee's right to be free from excessive force is governed by the Fourteenth Amendment's "objective reasonableness" standard which "resemble[s] the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Id.* at 1182.

liability claims under 42 U.S.C. § 1983 against Defendants Lt. Gatlin, Captain Gonzalez, and Sheriff Davis. Defendants now move for summary judgment contending qualified immunity shields them from § 1983 liability, and Defendant Ferrer contends he is also shielded by official immunity from Plaintiff's state law claims. As explained below, the Court finds Defendants Gatlin, Gonzalez, and Davis are shielded by qualified immunity on Plaintiff's supervisory liability claims. Defendant Ferrer, however, is not entitled to qualified immunity on Plaintiff's excessive force claims or official immunity on Plaintiff's assault and battery claims under Georgia law.

## I.   Defendant Ferrer's Motion for Summary Judgment

### A.  § 1983 Excessive Force Claim

Qualified immunity does not shield Defendant Ferrer from Plaintiff's excessive force claims. "[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."[99] As the Supreme Court recently reiterated, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[100]  "The purpose of this immunity is to allow government officials to

---

[99] *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted).
[100] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).

carry out their discretionary duties without the fear of personal liability or harassing litigation."[101]   Qualified immunity is immunity from suit and should be resolved as early as possible in the case.[102]

When an officer invokes qualified immunity, the initial burden is on the officer to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[103]  Once the officer satisfies that burden, the burden then shifts to the plaintiff to show that (1) a violation of a constitutional right occurred, and (2) that right was "clearly established" at the time of the violation.[104]

Here, it is clear Defendant Ferrer was acting within the scope of his discretionary authority.  Therefore, the burden shifts to Plaintiff to prove Ferrer's use of force was unreasonable and excessive and violated his clearly established Fourteenth Amendment right.

### 1.  Constitutional Violation

"Claims alleging excessive force by pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause."[105] A detainee must show "that the force

---

[101] *Lee*, 284 F.3d at 1194.
[102] *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).
[103] *Lee*, 284 F.3d at 1194.
[104] *Pearson*, 555 U.S. at 232.
[105] *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1300 (11th Cir. 2023) (citing *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021)).

purposely or knowingly used against him was objectively unreasonable."[106] "If an officer used objectively unreasonable force, he or she violated a detainee's Fourteenth Amendment rights" thereby satisfying the first prong of the qualified immunity analysis.[107]

Objective reasonableness turns on the "facts and circumstances of each particular case."[108] In making this determination, the Court must presume that the Plaintiff's version of the events is true,[109] but "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[110] The Court considers: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."[111]

The Court also needs to consider the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are

---

[106] *Kingsley*, 576 U.S. at 397.
[107] *Myrick*, 69 F.4th at 1301.
[108] *Id.* (internal quotation marks and citation omitted).
[109] *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).
[110] *Mercado*, 407 F.3d at 1157.
[111] *Myrick*, 69 F.4th at 1301 (quoting *Kingley*, 576 U.S. at 397).

needed to preserve internal order and discipline and to maintain institutional security."[112]

Taking each of these considerations into account and viewing the facts in the light most favorable to Plaintiff, the Court finds Ferrer's use of force in this case was objectively unreasonable. First, the amount of force needed to gain Plaintiff's compliance was excessive to the need for such force. Ferrer and three other deputies were present in the cell with Plaintiff attempting to have him remove his clothes, and a fifth deputy was standing in the doorway when Ferrer removed Deputy Pettigrew's baton and began repeatedly striking him on the head and upper body. Although the officers state Plaintiff resisted their attempts to remove his clothes, struck out at them, and attempted to injure himself with the scissors, Plaintiff states he never attempted to injure himself or anyone else, never swung at or attempted to punch any of the deputies, and he was simply trying to ascertain why Deputies Pettigrew and Barnes placed him in the Infirmary on suicide watch, when Deputy Ferrer entered the cell, grabbed Deputy Pettigrew's baton off his belt, and started hitting him.[113] The other deputies present stated they did not need Ferrer's involvement,[114] and the video confirms Plaintiff's size did not justify the use of potential deadly force. The Eleventh

---

[112] *Kingley*, 576 U.S. at 397 (internal quotation marks and citation omitted).
[113] Pl. Decl. ¶¶ 5-6.
[114] Pettigrew CID interview at 10:32-10:52; Barnes IA Interview at 4:13-4:27.

Circuit has held that striking someone on the head with a blunt object "poses a substantial risk of serious bodily injury, if not death" and "such action constitutes deadly force under our definition of that term."[115]

Second, Plaintiff was injured. He received five staples for a head laceration, and there was "a lot of blood in the shower, walls, and floor."[116] Plaintiff's "injuries, while not permanent, are suggestive of the harshness of the force applied against him."[117]

Third, Defendant Ferrer made no attempt to temper or limit the amount of force. Ferrer took the ASP baton from Deputy Pettigrew's belt even though he had no training and was not permitted to use it. He did not return the weapon when Pettigrew asked for it back, followed Plaintiff out of the cell continuing to strike him multiple times, only stopped when Pettigrew put himself between Ferrer and Plaintiff, and Plaintiff states Ferrer tried to strike him again while he was in the shower.

Finally, the severity of a security risk, the threat reasonably perceived by Ferrer, and Plaintiff's resistance do not outweigh the other factors to justify the amount of force Ferrer used. Ferrer argues that his use of the baton was reasonable to restrain Plaintiff, restore order, protect himself and the other deputies, and to protect medical staff and civilians in the area surrounding the cell. But Plaintiff states he ran out of the cell to

---

[115] *Baltimore v. City of Albany*, 183 F. App'x 891, 898 (11th Cir. 2006).
[116] Bibb County Investigative File at 9.
[117] *Patel*, 696 F.3d at 1184.

escape the attack where he knew he would be in view of the cameras in hopes Ferrer would stop beating him. The other deputies also testified that Plaintiff exited the cell to escape Ferrer. Indeed, the video footage shows Plaintiff moving out of the cell in a crouched position with his arms raised to protect his head from the baton strikes. Moreover, four other deputies were present to subdue Plaintiff and temper any security risk he posed.

This Court is mindful that "[o]fficers facing disturbances are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[118] But viewing the evidence in the light most favorable to Plaintiff, Ferrer's repeated use of the baton—a deadly weapon for which he was neither trained nor permitted to use—to violently strike Plaintiff on the head and upper body which could cause death or serious harm, in an effort to gain Plaintiff's compliance to undress in an Infirmary cell while four other officers were present, "crossed the line from a constitutionally permissible 'defensive or preventative' use of force to a constitutionally impermissible 'punitive' use of force against a pretrial detainee that was 'excessive in relation to [its] purpose.'"[119]

### 2. Clearly Established Law

---

[118] *Kingsley*, 576 U.S. at 399 (quoting *Graham v. Connor*, 490 U.S. 386, 387 (1989).
[119] *Coffman v. Battle*, 786 F. App'x 926, 931 (11th Cir. 2019) (quoting *Kingsley*, 576 U.S. at 954-55).

"For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates the law."[120] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[121]  In other words, the issue is whether the law gave the officer "fair warning" that his conduct was unconstitutional.[122]

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of law."[123]

Here, neither party identifies factually indistinguishable case law. But this is a case where a "general constitutional rule already identified in the decisional law … appl[ies] with obvious clarity" to Ferrer's conduct.[124] Existing case law at the time of this incident gave Deputy Ferrer fair warning that the repeated strikes to Plaintiff's head with an ASP baton to gain his compliance to undress, many of which were given as he

---

[120] *Bates v. Harvery*, 518 F.3d 133 (11th Cir. 2008).
[121] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[122] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[123] *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009).
[124] *Moore v. Pederson*, 806 F.3d 1036, 1047 (11th Cir. 2015) (quotations and citation omitted).

was trying to avoid the strikes with his arms raised in a defensive position and could cause death or serious harm, was vastly disproportionate to the need to use such force.[125] The Eleventh Circuit has "long made clear that 'prison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation."[126] "[A] constitutional violation occurs in this context where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased."[127] Thus, Defendant Ferrer is not entitled to qualified immunity.

## B. State Law Claims

### 1. Official Immunity

In addition to the § 1983 claims, Plaintiff brings state law assault and battery claims against Defendant Ferrer. Defendant Ferrer argues official immunity bars these claims. The Court disagrees.

---

[125] *See, e.g., Baltimore v. City of Albany, Ga.*, 183 F. App'x 891, 899 (11th Cir. 2006) (officer not entitled to qualified immunity where officer engaged in arresting plaintiff for violating a city ordinance struck plaintiff in head with a blunt object as he was being subdued by several officers; court held decisional case law applied with "obvious clarity" that a use of force that could cause death or serious harm to effectuate a misdemeanor arrest was excessive under the circumstances); *Robinson v. Lambert*, 753 F. App'x 777 (11th Cir. 2018).

[126] *Shuford v. Conway*, 666 F. App'x 811, 817 (11th Cir. 2016) (quoting *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987)).

[127] *Id.*

Under Georgia law, an officer is entitled to official immunity for injuries caused by his actions unless he negligently performed "ministerial functions" or performed "official functions" "with actual malice or with actual intent to cause injury."[128]  Georgia courts define "official functions" as "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts."[129]  Plaintiff does not dispute that Defendant Ferrer was engaged in a discretionary act.

Here, to overcome official immunity, Plaintiff must provide sufficient evidence to suggest Ferrer acted with "actual malice or with actual intent to cause injury." "The bar for proving malice or an intent to cause injury is high."[130]

> [A]ctual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff[]. Likewise, the phrase "actual intent to cause injury" has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive.[131]

Construing the facts in the light most favorable to Plaintiff, genuine issues of material fact exist whether Ferrer acted with malice or intent to cause injury.  Georgia

---

[128] *Gilbert v. Richardson*, 264 Ga. 744, 753 (1994) (quoting Ga. Const. art. I, § II, ¶ IX(d)).

[129] *Id.* at 753.

[130] *Schwartz v. Gwinnett Cnty., Ga.*, 924 F. Supp. 2d 1362, 1378 (N.D. Ga. 2013).

[131] *Marshall v. Browning*, 310 Ga. App. 64, 67-68 (2011).

courts have held that "[a] factfinder may infer from evidence that a defendant acted with actual malice."[132] The Eleventh Circuit has also recognized that "a jury can infer actual malice based on an officer's conduct."[133] Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude from Ferrer's conduct he acted with actual malice and an intent to cause harm when he repeatedly struck Plaintiff in the head to have him undress when Plaintiff was not fighting and four other officers were present.

## II.  BCSO Defendants' Motion for Summary Judgment

### A.  Official Capacity Claims

To the extent Plaintiff seeks to recover damages against the BCSO Defendants in their official capacities, such claims would be barred by the Eleventh Amendment. Under the Eleventh Amendment, a State is immune from suit in federal court without its consent.[134] This immunity extends to an "arm of the State," which includes agents and instrumentalities of the State.[135] The BCSO Defendants were employed by the Bibb

---

[132] *Lagroon v. Lawson*, 328 Ga. App. 614 (2014).

[133] *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016).

[134] *Scruggs v. Lee*, 256 F. App'x 229, 231 (11th Cir. 2007) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).

[135] *Id.* (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997)).

County Sheriff's Office. In Georgia, sheriffs and their deputies executing use-of-force policies at the jail are entitled to Eleventh Amendment immunity.[136]

## B. Individual Capacity Claims—Supervisory Liability

Plaintiff asserts supervisory liability claims against the BCSO Defendants. Because Plaintiff was a pretrial detainee in the Bibb County Jail, his claims must be analyzed under the Due Process Clause of the Fourteenth Amendment.[137]

Plaintiff alleges Captain Gonzalez, Sheriff Davis, and Lieutenant Gatlin are liable for Defendant Ferrer's actions as supervisors under 42 U.S.C. § 1983. "It is well established in this Circuit that supervisory officials are not liable under §1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."[138] "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participated in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."[139] None of the BCSO Defendants personally participated in

---

[136] *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003); *see also Purcell ex rel Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1325 (11th Cir. 2005) ("[A]uthority and duty [of the sheriff] to administer the jail in his jurisdiction flows from the State, not the County.").

[137] *Cagle v. Sutherland*, 334 F.3d 980, 985-86 (11th Cir. 2003); *Goodman v. Kimbrough*, 718 F.3d 1325, 1336 n. 1 (11th Cir. 2013).

[138] *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).

[139] *Id.* (citations omitted).

Plaintiff's injury, so the Court looks to whether there is a causal connection between their actions and the alleged constitutional violation.

"The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."[140] "Alternatively, the causal connection may be established when a supervisor's custom or policy … result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."[141] "Under certain circumstances, a law enforcement agency's failure to adequately train its officers may constitute a 'policy' giving rise to governmental liability."[142] "Ultimately, though, '[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous.'"[143]

Plaintiff first argues Ferrer's history of widespread abuse put the BCSO Defendants on notice of the need to correct the alleged deprivation, and they failed to do so.  In cases where a history of widespread abuse puts the responsible supervisor on

---

[140] *Id.* at 1356 (citation omitted).
[141] *Id.* (citation omitted).
[142] *Id.* (citation omitted).
[143] *Id.* (quoting *Braddy v. Fla. Dep't of Labor & Emp't. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).

notice, "the deprivations 'must be obvious, flagrant, rampant and of continued duration' in order to provide meaningful notice."[144]

Even if the Court assumes Ferrer's history of previous use of force incidents was "obvious, flagrant, rampant and of continued duration" that sufficiently notified the BCSO Defendants of a need to correct Ferrer's behavior, they did not "fail[ ] to do so." The record shows the BCSO *did* investigate each of Ferrer's use of force and *did* discipline him for the instance of misconduct that was substantiated—he was suspended and then terminated from employment because of the abuse at issue in this case.

The record shows that all uses of force reported by Ferrer from the date his employment began—December 18, 2017—up until the December 13, 2019 incident involving the use of pepper spray on the detainee in the Infirmary, were reviewed by Corrections Division command staff members from lieutenant up through the chain of command to the Chief Deputy and were found to be in compliance with the BCSO's policy governing use of force. IA was still investigating the December 13, 2019 pepper spray incident when Ferrer was terminated for the January 8, 2020 incident at issue in this case. Moreover, Ferrer's performance evaluations establish that his supervisors were monitoring his aggressiveness and bringing it to his attention. Sheriff Davis

---

[144] *Quinette v. Reed*, 805 F. App'x 696, 706 (11th Cir. 2020) (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990)).

testified that "whenever [supervisors] do the evaluations [they] sit down with that [deputy] and [ ] go over what they need to improve on and what they need to do. So these things were covered with [Ferrer] going forward."[145]

Defendant Lieutenant Gatlin[146] was Plaintiff's squad lieutenant for almost 9 months from April 21, 2019, through his termination on January 13, 2020. During that time, the evidence shows that Ferrer completed 8 use of force reports. Again, each of these use of force instances up until the December 13, 2019 incident involving the use of pepper spray on detainee Finnell were investigated and reviewed by the chain of command to the Chief Deputy and were found to be in compliance with the BCSO's use of force policy—including the October 2019 incident that was referred to and investigated by IA—and no policy violation was found. The pepper spray incident was being investigated when Ferrer was suspended and ultimately terminated for his actions involving Plaintiff in this case. Moreover, none of these instances involved the unauthorized use of an ASP baton or other weapon. Even assuming these instances put Lt. Gatlin on notice of a need to correct Ferrer's behavior, Plaintiff cannot establish he

---

[145] Sheriff Depo., p. 42.

[146] Plaintiff cannot maintain a failure to intervene claim against Lt. Gatlin. "Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (emphasis added). Lt. Gatlin was not present when the events in this case took place. He was off duty and on his way home when the use of force incident involving Plaintiff took place on January 8, 2020. Thus, he could not have intervened to stop Ferrer.

had subjective knowledge of a risk of serious harm that he disregarded by conduct that was more than gross negligence.

Plaintiff points to a statement by a deputy during the IA investigation of Ferrer's use of pepper spray on the detainee in the Infirmary, who said Defendant Gatlin lets "Ferrer do what he wants to do, and nothing is said nor done about it."[147] Plaintiff contends this statement, together with the lack of discipline imposed on Ferrer, creates a genuine issue of material fact on the supervisory liability claim against Lt. Gatlin. But one opinion from another deputy does not create a genuine issue of material fact. Again, every use of force Ferrer reported was reviewed by the BCSO's chain of command, not just Lt. Gatlin.

Plaintiff next argues the BCSO's official policies resulted in deliberate indifference to his constitutional right to be free from excessive force and caused Plaintiff's injuries. Plaintiff contends the BCSO Defendants had a custom or policy of not suspending deputies under IA investigations of excessive force and instead allowing them to continue interacting with the pretrial detainees. Because IA investigations can take from "several weeks to a couple of months" to complete, the no-suspension policy, in turn, permits deputies to repeatedly engage in excessive uses of

---

[147] IA Investigation of Dec. 13, 2019 pepper spray incident [Doc. 81-9, p. 5].

force and results in violations of detainees' constitutional rights. The Court is unconvinced.

A policy is a decision "officially adopted by the [law enforcement agency] or created by an official of such rank that she could be said to be acting on behalf of the [law enforcement agency]."[148] A custom is an "unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."[149] A plaintiff must show "a persistent and widespread practice,"[150] and the alleged unconstitutional act "must have been carried out pursuant to the alleged policy or custom."[151]

Plaintiff fails to establish Sheriff Davis or Captain Gonzalez implemented any official policy, consistent custom, or widespread practice to allow deputies under IA investigations for excessive force incidents to remain with detainees and repeatedly engage in excessive uses of force. Sheriff Davis testified that the BCSO "protocol is if there's an Internal Affairs investigation of a serious matter, that we suspend that particular or employee[.]"[152] Thus, deputies who engage in serious use of force incidents

---

[148] *Christmas v. Harris Cnty*, 51 F.4th 1348, 1353 (11th Cir. 2022) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).

[149] *Id.* (quoting *Goebert v. Lee Cnty*, 510 F.3d 1312, 1332 (11th Cir. 2007)); *see also Hale v. Tallapoosa Cnty*, 50 F.3d 1579, 1582 (11th Cir. 1995) (a custom or practice must be "so pervasive as to be the functional equivalent of a policy adopted by the final policymaker.").

[150] *Goebert*, 510 F.3d at 1332.

[151] *Myrick v. Fulton Cnty*, 69 F.4th 1277, 1298 (11th Cir. 1998).

[152] Davis Depo., p. 22.

are, in fact, suspended. Indeed, Ferrer was immediately suspended for his actions in this case. Plaintiff takes issue that Ferrer was not suspended after the pepper spray incident on December 13, 2019. But failure to suspend Ferrer on this occasion does not establish a BCSO policy, custom, or practice that resulted in the deprivation of Plaintiff's constitutional rights.

Plaintiff's reference to Ferrer's use of force statistics does not change the result. Plaintiff attached use of force logs from which he calculated that "Ferrer accounted for approximately nine percent of all use of force incidents in the Bibb County jail at which he was just one of 140 officers on staff."[153] The mere occurrence and reporting of uses of force in the Jail do not evidence abuse of inmates or detainees. The Bibb County Jail houses more than 900 inmates and detainees, and the statistics and logs provide no details or information about the uses of force.

The BCSO's use of force policy requires Corrections officers to report every use of force, from handcuffing a detainee to use of deadly force. Moreover, working in the Jail, Sheriff Davis testified that Corrections deputies "have to show authority[,] … have to be sometimes strict[,] … have to be in a mode that an inmate is not going to want to try … to attack or do anything like that. We call it command presence…. [Deputies] have to

---

[153] Plaintiff's Response Brief, [Doc. 81, p. 1].

show some air of authority, some almost aggressiveness. Some might see that as aggressive but [it's] an air of authority."[154]

Finally, to deny Sheriff Davis, Captain Gonzalez, and Lieutenant Gatlin qualified immunity, the Court must conclude that a failure to suspend a subordinate after every use of force that is investigated by IA is a violation of clearly established law that could expose them to personal liability. This Court cannot reach that conclusion. The evidence in this case is plainly distinguishable from that before the Eleventh Circuit in *Shuford v. Conway*[155] where plaintiffs provided "eight video discs full of RRT [Rapid Response Team] incidents; the sheriff defendant had viewed "many RRT videos, including at least fifty that involved use of a restraint chair"; the sheriff had received "very vocal … criticism" from a  lieutenant about the RRT's actions; the lieutenant colonel defendant had "reviewed and signed off on every single written report of an RRT entry and use of force"; the lieutenant colonel had reviewed hundreds of RRT videos over the previous five years; and the lieutenant colonel was "a direct overseer of the RRT, selected the RRT staff, and trained them."[156]

"In this Circuit, the published excessive force cases imposing supervisory liability appear to all involve supervisors who took <u>no</u> action when aware of their

---

[154] Sheriff Depo., p. 34.
[155] 666 F. App'x 811, 818 (11th Cir. 2016).
[156] *Id.* at 818-19.

subordinate's unlawful conduct."[157] In *City of Escondido v. Emmons*, the Supreme Court emphatically instructed lower courts "not to define clearly established law at a high level of generality."[158] In other words, the "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."[159] Here, the supervisors <u>did</u> investigate and act when Ferrer's use of force was determined to be a violation of BCSO policies. "While reasonable minds may disagree about the level of discipline necessary to prevent further misconduct, the sanctions imposed here were real"—including suspension and termination.[160]

Because case law does not lead to a conclusion that the BCSO Defendants violated clearly established law, they may not be held liable for Ferrer's unconstitutional conduct.

## CONCLUSION

Based on the foregoing, Defendant Ferrer is not entitled to qualified immunity on Plaintiff's excessive force claim under 42 U.S.C. § 1983 or official immunity on Plaintiff's

---

[157] *Quinette v. Reed*, 805 F. App'x 696, 706 (11th Cir. 2020) (citing *Danley v. Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008) (supervisors "did not discipline known incidents, and did not conduct additional training despite knowledge that pepper spray was being improperly used on a regular basis by jailers and that inmates were being denied proper treatment after spraying incidents); *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (warden took no action in response to evidence of widespread beatings and torture by prison guards); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) (supervisor "failed to take corrective steps although was aware of police use of unlawful, excessive force.")).

[158] 586 U.S. ___, 139 S. Ct. 500, 503 (2019).

[159] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

[160] *Quinnett*, 805 F. App'x at 707.

assault and battery claim under Georgia law; thus, his Motion for Summary Judgment [Doc. 33] is **DENIED**. The BCSO Defendants, however, are entitled to qualified immunity, and their Motion for Summary Judgment [Doc. 47] is **GRANTED**.

**SO ORDERED,** this 28th day of March, 2024.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT JUDGE